J-A34019-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| LINDE CORPORATION | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| BLACK BEAR PROPERTY, LP, BLACK BEAR HOLDINGS, LLC, STEWART E. DIBBLE, PENN CENTRAL CO., BLACK BEAR, LLC | |
| | No. 645 MDA 2015 |

Appeal from the Judgment Entered July 1, 2015
In the Court of Common Pleas of Lycoming County
Civil Division at No(s): 13-01163

------------------------------------------------------------------------------

| | |
|---|---|
| LINDE CORPORATION | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| BLACK BEAR PROPERTY, LP, BLACK BEAR HOLDINGS, LLC, STEWART E. DIBBLE, PENN CENTRAL CORPORATION, AND BLACK BEAR, LLC. | |
| Appellant | No. 689 MDA 2015 |

Appeal from the Judgment Entered July 1, 2015
In the Court of Common Pleas of Lycoming County
Civil Division at No(s): 13-01163

BEFORE:  PANELLA, J., OTT, J., and JENKINS, J.

MEMORANDUM BY OTT, J.:                          **FILED JANUARY 29, 2016**

In this cross-appeal, Plaintiff, Linde Corporation, and Defendants, Black Bear Property, LP, Black Bear Holdings, LLC, Black Bear, LLC, and Stewart E. Dibble,[1] appeal from different aspects of the judgment entered in the Court of Common Pleas of Lycoming County, on March 19, 2015.[2] The March 19, 2015 order entered judgment on a mechanics' lien in favor of Linde in the amount of $216,074.38, plus interest at the legal rate, on properties identified as Lycoming County Tax Parcel numbers 24-268-183.A, 24-268-152 and 24-268-149 (hereinafter, parcels 183.A, 152, and 149). The trial court denied the lien requested by Linde on parcel number 24-268-151 (parcel 151). Following a thorough review of the submissions by the parties, the certified record, and relevant law, we affirm.

At issue in this appeal is the ownership of parcels 183.A, 152, and 149, and whether parcel 151 should be included in the lien. The trial court allowed the lien on the properties, except parcel 151. Linde now argues the trial court erred in not placing the lien on all four properties, while the Defendants claim the trial court erred in determining Black Bear was the constructive owner of the land.

---

[1] The trial court noted that Black Bear Property, LP, and Black Bear, LLC, are no longer entities. Accordingly, any reference to the "Defendants" means Black Bear Holdings, LLC, and Dibble. *See* Trial Court Opinion, 1/13/2015.

[2] Summary judgment was granted in Penn Central Corporation's favor on September 24, 2014. Penn Central has no interest in this appeal.

Briefly, Black Bear hired Linde to construct a water pumping station on parcels 183.A, 152 and 149 ("the properties"). This pumping station would draw water from the Lycoming Creek, to be sold to energy companies for use in hydraulic fracking. A fourth parcel, 151, was also owned by Black Bear which borders on lot 183.A. Power lines to the pumping station were routed through an existing building on parcel 151 to the pumping station.

Linde built the pumping station but was only partially paid for its work. Relevant to this action, Linde sought to impose a mechanics' lien on the four parcels (the properties and parcel 151). Dibble was a 25% owner of all of the Black Bear entities. He also was the prior owner of parcels 149, 152 and 183.A. Dibble agreed to transfer ownership of the properties to Black Bear in exchange for 25% ownership in the Black Bear entities. However, at trial, the Defendants argued transfer of ownership of the properties never occurred, even though Dibble admittedly owned 25% of Black Bear. Accordingly, at trial the Defendants argued Linde was not entitled to a lien against the properties because Linde's contract was with Black Bear, a tenant, not the owner. Defendants claimed because Dibble, the true owner of the property, did not sign the construction contract with Linde, Linde could not place a mechanics' lien on the property. The trial court determined Black Bear was the constructive owner of the properties and entered the lien against them as noted above. However, also as noted, the trial court refused to place the lien on parcel 151. In that regard, the trial court reasoned Linde had not improved parcel 151.

We review the trial court's holding for abuse of discretion. ***Artsmith Development Group, Inc. v. Updegraff***, 868 A.2d 495, 498 (Pa. Super. 2005). Because we review the interpretation and application of the Pennsylvania Mechanics' Lien Law, 49 Pa.C.S. § 1101 *et sec.*, our scope of "review is plenary and non-deferential." ***Terra Technical Services, LLC v. River Station Land, L.P.***, 124 A.3d 289, 298 (Pa. 2015).

We begin our analysis with Linde's claim the trial court erred in failing to place the mechanics' lien on parcel 151.

Section 1301 of the Mechanics' Lien Law is relevant to all aspects of this appeal. It states:

> General Rule. Except as provided under subsection (b), every improvement and the estate or title of the owner in the property shall be subject to a lien, to be perfected as herein provided, for the payment of all debts due by the owner to the contractor or by the contractor to any of his subcontractors for labor or materials furnished in the erection or construction, or the alteration or repair of the improvement, provided that the amount of the claim, other than amounts determined by apportionment under section 306(b) of this act, shall exceed five hundred dollars ($500).

49 P.S. § 1301(a).

The statutory definitions of "improvement" and "erection, construction, alteration or repair" are also relevant.

> (1) "Improvement" includes any building, structure or other improvement of whatsoever kind or character erected or constructed on land, together with the fixtures and other personal property used in fitting up and equipping the same for the purpose for which it is intended.

- 4 -

\*\*\*

(10) "Erection and construction" means the erection and construction of a new improvement or of a substantial addition to an existing improvement or any adaptation of an existing improvement rendering the same fit for a new or distinct use and effecting a material change in the interior or exterior thereof.

\*\*\*

(12) "Erection, construction, alteration or repair" includes:

(a) Demolition, removal of improvements, excavation, grading, filling, paving and landscaping, when such work is incidental to the erection, construction, alteration or repair;

(b) Initial fitting up and equipping of the improvement with fixtures, machinery and equipment suitable to the purposes for which the erection, construction, alteration or repair was intended; and

(c) Furnishing, excavating for, laying, relaying, stringing and restringing rails, ties, pipes, poles and wires, whether on the property improved or upon other property, in order to supply services to the improvement.

49 P.S. § 1201(1),(10), and (12).

We agree with the compelling reasoning of the trial court that Linde is not entitled to a lien on parcel 151. The trial court found that running the power lines through an existing junction box in an existing building located on adjoining property, did not equate to construction in the ordinary sense. *See* Trial Court Opinion, 1/13/2015, at 14. Pursuant to the Mechanics' Lien Law, a lien is allowed for an improvement to property. 49 P.S. § 1301. An improvement includes "erect[ion] and construct[ion]." 49 P.S. § 1201.

"Erection and construction" is subsequently defined in relevant part as an "improvement or … substantial addition … or any adaptation of an existing improvement … effecting a material change in the interior or exterior thereof." *Id*. Our independent review of the certified record leads us to conclude the work performed on parcel 151 did not effect a material change to the structure located thereon because running wires through an existing junction box was merely incidental to the property. Accordingly, we find no abuse of discretion in this aspect of the trial court's ruling.

The trial court further reasoned that the wiring fit the statutory definition of "erection, construction, alteration, or repair" under 49 P.S. § 1201(12)(c). This entitled Linde to include the value of that work in the amount of the lien. However, sub-paragraph (c) draws a distinction between improvements on the property and work done on "other property."[3] The trial court opined: "This latter definition implies that the furnishing of wires may be included in the amount of the lien, but by reference to 'other property' separate from 'the property improved' it is clear that 'other property' is not to be included in the lien." *See* Trial Court Opinion, 1/12/2015, at 15-16. We agree. Because the wiring regarding parcel 151 was not an improvement to that parcel, it was better defined as work performed "upon *other property*, in order to supply services to the

_____

[3] *Id*. at (c).

improvement", 49 P.S. § 1201(12)(c) (emphasis added), and the "other property" is not to be included in the lien.

Linde also argues that the construction of the water pumping station is an improvement and, pursuant to *In re Skyline Properties, Inc.*, 134 B.R. 830 (W.D.Pa. 1992), it is entitled to a lien on all of the parcels because the work performed, including bringing electric power to the pumping station, "was reasonably needed for the general purposes for which the structure or other improvement was made." *Id*. at 836, *quoting*, *Wersing v. Pennsylvania Hotel & Sanitarium Co.*, 75 A. 259 (Pa. 1910).

It is true that providing electric power to the pumping station is "reasonably needed" for the station to operate. In *Skyline*, multiple adjoining properties were purchased for creating Hunter's Station, a "multifaceted resort." *Id*. at 832. The *Skyline* contractor provided excavating and grading services to five of the seven properties. When payment was not forthcoming, contractor sought a mechanics' lien on the three properties where the majority of work took place. The Bankruptcy Court noted that Hunter's Station, consisting of tack shop, horse barn, riding area, camping sites, golf courses, and restaurants, was intended to be an integrated whole. Accordingly, the reasonably needed improvements provided by contractor to the three properties benefitted all the properties. Although contractor sought the lien against only three of the lots, the Bankruptcy Court noted contractor could have obtained the lien against all the lots.

Initially, we note that **Skyline** is a federal decision and the bankruptcy court's comments upon contractor being entitled to liens on all of the lots were merely *dicta*. Accordingly, we are not bound by the **Skyline** decision.

Additionally, we believe **Skyline** is distinguishable from the instant factual scenario. A central aspect of the **Skyline** *dicta* was that all the properties involved in the Hunter's Station development were meant to be included as an integrated whole. The proposed golf courses, restaurants, etc. were to be part of a single resort. The grading and excavation to some of the properties provided by contractor provided a demonstrable benefit to the integrated whole. Based upon this, the bankruptcy court reasoned the lien could have attached to all of the involved properties, not just those specifically named by contractor. No such demonstration of benefits to parcel 151 is found herein.

Linde provided improvements to parcels 149, 152, and 183.A., all of which were directly linked to the water pumping station. However, parcel 151, while adjoining parcel 183.A, was not directly affected by those improvements, and received no demonstrable benefit therefrom. Importantly, there was no evidence demonstrating how parcel 151 was part of an integrated whole; there was no evidence that parcel 151 was necessary to the development of parcels 149, 152 and 183.A. As noted, the plans, submitted as Exhibit A to the complaint, simply show parcel 151 as adjoining parcel 183.A. Ingress and egress to the three lots is provided next to, but not over, parcel 151. The only evidence of use of parcel 151 was the

claim the electric wires were run from the main road through a junction box located on a building that already existed on parcel 151 and then onto the pumping station, which was located on another lot. In contrast to **Skyline**, where the work performed benefitted the entire integrated property, none of the work Linde performed provided a demonstrable benefit to parcel 151. Furthermore, other than providing an incidental benefit to the water pumping station of the use of an existing electric junction box, there was no evidence that parcel 151 was part of an integrated plan for use of all of the parcels. Accordingly, in addition to being non-binding, we believe Skyline is substantively distinguishable, as well.

In light of the above, we find the trial court did not abuse its discretion in denying Linde a lien against lot 151.

Next, as to the counter-claim, Defendants argue the trial court erred in determining Black Bear Holdings, LLC, was the equitable owner of parcels 149, 152 and 183.A, thereby allowing Linde a mechanics' lien against those properties.

The evidence developed in this matter presents a tangled web of stories. Essentially, the defense claimed that while Linde contracted with Black Bear Holdings, LLC to build the water pumping station, Dibble had only conditionally sold the property to Black Bear. The Defendants claimed because certain conditions for the transfer of the property, such as paying off a lien, had not occurred, Black Bear never owned the land. According to the Defendants, Dibble retained ownership and leased the property to Black

Bear. The Defendants asserted that because Linde did not contract with the Dibble, the rightful owner of the land, no lien could lawfully attach.

The trial court rejected that argument, and made findings that directly contradicted defense assertions. *See* Opinion and Order, 1/13/2015, at 2-6. Our review of the certified record leads us to conclude the trial court's findings and attendant conclusions of law are fully supported by the record. We are mindful that, "[t]his Court defers to the credibility determinations of the trial court as to witnesses who appeared before it." *Ferko-Fox v. Fox*, 68 A.3d. 917, 927 (Pa. Super. 2013) (citation omitted).

We take particular note of the trial court's repeated determination of a lack of credibility of defense witnesses. "Overall, this testimony, from both Stewart Dibble and William Epp, [another partner in the Black Bear entities] is contradictory and confusing. It is not credible and cannot serve as the basis for a finding that BBH leased the property from Dibble." *Id*. at 10.

Additionally, while the defense in this matter was predicated on the assertion Dibble owned the land in question, the trial court noted, "Finally, in the Luzerne County lawsuit, [which appears to be a breach of contract action] Defendants asserted that 'Stewart Dibble has no personal ownership of any of the property.'" *Id*. at 13. The defense position in the instant matter directly contradicts the defense asserted in the companion case filed in Luzerne County.

The trial court has provided detailed findings of fact and a thorough analysis regarding the issues raised by Dibble and the Black Bear entities. Because the trial court's findings of facts, including the rejection of the Defendants' credibility, are amply supported by the record, and we find no error of law in the trial court's conclusions regarding the denial of the defendants' arguments, we adopt the trial court's opinion in that regard. *See* Opinion and Order, 1/13/2015, at 1-14.

Judgment affirmed. Parties are directed to attach pages 1-14 of the January 13, 2015, Opinion and Order in the event of further proceedings.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 1/29/2016

- 11 -

T. Woolford

IN THE COURT OF COMMON PLEAS OF LYCOMING COUNTY, PENNSYLVANIA

LINDE CORPORATION,
        Plaintiff

    vs.

BLACK BEAR PROPERTY, LP, BLACK BEAR
HOLDINGS, LLC, STEWART E. DIBBLE, and
BLACK BEAR, LLC,
        Defendants

: NO. 13 - 01,163
:
: CIVIL ACTION - LAW
:
:
:
:
:
:
: Non-jury Trial

## *OPINION AND ORDER*

Before the Court is Plaintiff's Complaint to Obtain Judgment and to Enforce Mechanic's Lien Claim, filed September 6, 2013.[1] A trial was held on October 14, 2014, following which the parties requested and were granted the opportunity to file briefs. On October 22, 2014, Defendants[2] filed a brief and Plaintiff filed a Motion to Amend Complaint, seeking to amend the Complaint to address certain evidence introduced at trial. Argument on that motion was heard November 14, 2014, following which argument the court scheduled an additional hearing, which was held December 15, 2014. Plaintiff then requested and was granted the opportunity to file the brief which was to have been filed following the first trial, and that brief was filed January 5, 2015. The matter is now ripe for decision and the Court enters the following:

---

[1] The Mechanic's Lien Claim was filed May 16, 2013.

[2] It appears there is no such entity as Black Bear Property, LP or Black Bear, LLC. Therefore, in referring to "Defendants", the court refers to only Black Bear Holdings, LLC and Stewart E. Dibble.

## FINDINGS OF FACT

(1) Plaintiff Linde Corporation is a site and utility contractor with a main office in Pittston, Pennsylvania.

(2) Defendant Black Bear Holdings, LLC ("BBH"), is a limited liability company formed in 2011 for the purpose of real estate acquisition and development. At the time of formation, William Epp, John DiNaso, Sr. and Joshua Phillips were all the members of the LLC. William Epp was appointed to serve as the Managing Member.

(3) In 2011, BBH acquired a parcel of real estate in Lewis Township known as tax parcel 24-268-151.

(4) In 2011, Defendant Stewart Dibble ("Dibble") owned three adjacent (to the BBH parcel) parcels, specifically tax parcel 24-268-183.A, tax parcel 24-268-152 and tax parcel 24-268-149.

(5) On March 15, 2012, the members of BBH and Dibble entered an agreement "to provide for the transfer of the Dibble Parcel to BB Holdings in exchange for the satisfaction of certain liens on the Dibble parcel and a transfer of a total of 25% of BB Holdings equally from the shares of Epp and DiNaso to Dibble".

(6) The March 15, 2012, agreement was entered in anticipation of the development of the combined properties as a water withdrawal facility.

(7) The March 15, 2012, agreement provided that "contemporaneously with the execution" thereof, Epp and DiNasso "shall pay such sums as are necessary to fully settle and satisfy all record liens on the Dibble Parcel, consisting of the following three liens." Four items are then listed: (a) First National Bank of PA: $45,000.00; (b) Matthew Sauder: $801.24; (c)

2

Northwest Consumer Discount Company: $4,511.65; and (d) Mary Ann Yoder: $35,000.00.[3] The agreement specifies that the sums listed are "subject to any modifications made by the creditor by the time of final payment and satisfaction".

(8) The March 15, 2012, agreement also provided that "[u]pon payment of said liens and satisfaction of same, Dibble shall convey the Dibble Parcel to BB Holdings, by special warranty deed, further conditioned upon Epp and DiNasso transferring part of their interests in BB Holdings to Dibble" such that Dibble became 25% owner in the company.

(9) In the March 15, 2012, agreement, the parties agreed to "promptly execute any and all further documents incidental to the implementation of the terms of this agreement", and also "acknowledge[d] that each aspect of the foregoing transaction is mutually interdependent with the other aspects, deed transfer and BB Holdings membership interest transfers must occur simultaneously".

(10) Dibble acquired a 25% interest in BBH on March 15, 2012.[4]

(11) Epp contacted Plaintiff sometime prior to April 19, 2012, and requested a bid on the proposed water withdrawal facility. Epp submitted to Plaintiff an "Operations Plan" designed by Barry Isett & Associates, Inc., dated April 19, 2011. The Plan's "project property boundary" includes, among others,[5] the four parcels referenced in Paragraphs 3 and 4, above, and

---

[3] No explanation was provided as to the discrepancy between the reference to three liens but the listing of four items.

[4] Dibble testified to such. See N.T., October 14, 2014, at p. 100.

[5] Only the four parcels referenced in Paragraphs 3 and 4 are at issue, as the work done by Plaintiff affected only those parcels.

3

shows parcel 151 as being owned by "Black Bear Property, LP" and parcels 183.A, 152 and 149 as being owned by Dibble.

(12) Plaintiff submitted a "Proposal" dated April 19, 2012, and on April 20, 2012, by Epp's acceptance of that proposal, Plaintiff and BBH entered a contract whereby Plaintiff would construct certain portions of the water withdrawal facility per the Operations Plan in exchange for a payment of $251,248.00.[6]

(13) A $25,000.00 deposit was provided to Plaintiff from BBH by check dated April 21, 2012. Work on the facility began on or about that time.

(14) Following an invoice dated May 31, 2012, an additional payment of $50,254.32 was made to Plaintiff from BBH by check dated June 4, 2012.

(15) Two change orders were agreed to by BBH, one for mechanical and electrical revisions, at a cost of $23,481.66, and one for additional pipe and conduit, at a cost of $16,599.04.

(16) Toward the total contract price of $291,328.70, only the two above-referenced payments were made. Under the contract, $216,074.38 remains due and owing.

(17) On May 31, 2012, Dibble and Mary Ann Hill-Yoder executed a deed purporting to transfer all their interest in "five parcels and lots of land" in Lewis Township to BBH. The metes and bounds descriptions refer to tax parcels 24-268-149 and 24-268-152, and include three other parcels which are not identified by parcel number but appear to include tax parcel 24-268-183.A.[7] This deed has not been recorded.

---

[6] Other portions of the facility, including a large water tank, were already completed or were subsequently completed by others.

[7] See Exhibit 24. See also, N.T., October 14, 2014, at p. 108.

4

(18) Sometime prior to November 13, 2012, BBH applied for a Business Loan with Susquehanna Bank.[8] In making the application, it was represented to Susquehanna that funds were being requested to re-finance certain debt and to pay the indebtedness to Plaintiff, among other things. Parcels 150, 149 and 152, as well as three others not involved herein, were to be encumbered by a mortgage.[9] It was represented to Susquehanna that BBH either owned or by closing would own all of the properties being mortgaged. A copy of the May 31, 2012, deed was provided to the Bank and the Bank was never informed that the deed had not been recorded or was being held and had not been delivered.

(19) As the property described in the deed of May 31, 2012, had a lien against it held by Mary Ann Hill-Yoder, in order to obtain first lien priority, the Bank required a pay-off of that lien at closing.

(20) A closing on the loan was held January 9, 2013. $25,000.00 was paid to Mary Ann Hill-Yoder.

(21) None of the other three items listed in the March 15, 2012, agreement was paid directly from the settlement funds. These items were apparently not liens against the property.

(22) The Loan Agreement and Mortgage were signed by Epp, DiNasso, Phillips and Dibble, all as "Member of Black Bear Holdings, LLC". Dibble did not sign individually.

---

[8] The Loan Agreement identifies the "Borrower" as Black Bear Holdings, LLC and Black Bear Waters, LLC. Black Bear Waters, LLC was formed to hold the water withdrawal facility; Black Bear Holdings, LLC was formed to hold the real estate on which the facility was constructed. The March 15, 2012, agreement refers to a lease to be entered into between Holdings and Waters. As Waters did not enter the contract with Plaintiff, and does not own the real estate in question, further findings with respect to Waters are considered unnecessary.

[9] Again, Parcel 183.A was not included by reference to the parcel number and it is thus unclear whether the mortgage encumbers that parcel, but such is not relevant to the instant dispute.

5

(23) Dibble did sign a Commercial Guaranty individually, personally guaranteeing the Loan Agreement. (Epp and DiNasso also, as individuals, signed Commercial Guaranties.)

(24) In a lawsuit filed in Luzerne County,[10] in which Plaintiff seeks payment under the contract which serves as the basis for the instant mechanic's lien, Plaintiff alleges that "[i]t is unjust for the property owners, Black Bear Holdings, Stewart Dibble and American Premier Underwriters, to retain the benefits of the improvements Linde provided to their land without paying for the same."[11] In Preliminary Objections filed March 24, 2014, Dibble (as one of the "Answering Defendants") asserts that the Complaint "really only provides a factual basis for a breach of contract claim against Black Bear Water, LLC"[12] and that "Stewart Dibble has no personal ownership of any of the property and thus he cannot be unjustly enriched."[13]

## DISCUSSION

The Mechanics' Lien Law of 1963 provides, in pertinent part, that

> Every improvement and the estate or title of the owner in the property shall be subject to a lien, to be perfected as herein provided, for the payment of all debts due by the owner to the contractor … for labor or materials furnished in the erection or construction … of the improvement, provided that the amount of the claim … shall exceed five hundred dollars ($500).

---

[10] Apparently the suit is filed there as that is the county where payment is due. See Complaint filed January 17, 2014, to Luzerne County No. 2014 – 625, Paragraph 12.

[11] Id. at Paragraph 40.

[12] The Proposal refers to "Black Bear LLC". Defendants are asserting in the Luzerne County suit that such referred to Black Bear Waters, not Black Bear Holdings.

[13] See Preliminary Objections filed March 24, 2014, at paragraph 25.

6

49 P.S. Section 1301. The evidence at trial clearly indicates that Plaintiff, as contractor, constructed an improvement on property owned by someone, and that there is a debt due to Plaintiff for labor and materials furnished in the construction. Plaintiff contends, in its Amended Complaint, that that someone is BBH. Defendants contend, however, that Plaintiff contracted with BBH but the property is owned by Dibble, who had leased the property to BBH, thus triggering the requirement of the Mechanic's Lien Law that the contractor obtain a written consent from the landlord when constructing an improvement for the tenant, in order to enforce a lien against the property of the landlord.[14] Plaintiffs assert there was no lease, and in fact, BBH did own the property as a result of the May 31, 2012, deed. Defendants contend that deed was never delivered and therefore that property was never transferred to BBH. Plaintiff counters that even if the deed has yet to be delivered, BBH is nevertheless the equitable owner of the property as a result of the March 15, 2012, agreement, thus subjecting the property to a lien. Finally, Defendants argue that the portion of the facility which actually lies on the parcel owned by BBH, parcel number 151, is so insignificant that it cannot be considered an "improvement" or an "erection or construction" such as would subject the property to a mechanic's lien. Each of these issues will be addressed seriatim.[15]

---

[14] There is no dispute that no such written consent was obtained from Dibble.

[15] The issues developed over the course of these proceedings. In the Original Claim, Plaintiff contended the improvement was constructed on property owned by Dibble, Black Bear Holdings, LLC and Penn Central Corporation. (Penn Central was dismissed from the action when its motion for summary judgment was granted on September 23, 2014.) Based on the May 31, 2012, deed, introduced at the trial on November 14, 2014, Plaintiff seeks to amend the Claim and the Complaint to allege that BBH owns the property. At argument on the motion to amend, Defendants asserted the deed was never delivered. Upon agreement of counsel, further hearing was scheduled to address that issue. Based on the evidence introduced at that hearing on December 15, 2015, the court hereby grants the Motion to Amend.

## Lease of the Property

Defendants have asserted that Section 1303(d) prohibits the attachment of a lien in this case. That section provides: "No lien shall be allowed against the estate of an owner in fee by reason of any consent given by such owner to a tenant to improve the leased premises unless it shall appear in writing signed by such owner that the erection, construction, alteration or repair was in fact for the immediate use and benefit of the owner." 49 P.S. Section 1303(d). As stated previously, there is no written consent signed by Dibble.[16] Considering all of the evidence, however, the court cannot find that BBH was a tenant such that this section applies.

Dibble testified that he has a "verbal lease with Black Bear Holdings", that he "made it with William Epp."[17] He does not know the date of the lease, but testified that it was "done before they started work on the project."[18] He also testified that "[i]t was probably right at that same time", referencing the March 15, 2012, agreement.[19] There is no document to memorialize the lease.[20] Dibble testified that he "get[s] 500 from them", but did not bring copies of the checks to the hearing.[21] He stated that rent is paid "[w]hen we have money",[22] and the rent was last paid "[p]robably last month".[23] Dibble admitted that rent was not listed as an expense on Black Bear Holdings' financial statements for 2012 or 2013,[24] and when he admitted that there was not "a piece of paper at all anywhere in the

---

[16] For purposes of this argument, the court assumes Dibble is the owner.
[17] N.T., October 14, 2014, at p. 91.
[18] Id. at p. 96
[19] Id. at p. 100.
[20] Id.
[21] Id. at p. 92.
[22] Id. at p. 93.
[23] Id.
[24] Id. at p. 101-102.

world that [he was] aware of that corroborates the existence of [the] lease",[25] but then was reminded that he had "said [he] had some checks", he stated, "Well, whenever they had money they would give me some money just until we got up and going; and the company never got up and going. So we never really got nothing really to say paying the lease on time. It was just up in the air, like, you know, we'll give you $500.00 a month for lease; but it never got to that point because we never started pumping water."[26] While this sounds like Dibble was now saying he never received any rent, when asked by the court "So you never received any 500-dollar checks?",[27], he said, "I did a couple of them, yes sir."[28]

William Epp testified that BBH did not write checks for rent to Dibble, that Black Bear Waters did.[29] He said he did not know how many such checks had been written,[30] and when asked to admit that Black Bear Waters' financial statements did not reflect rent payments, he said the accountant "may have buried that into another operating expense for accounting reasons."[31] Finally on this subject, when asked whether he was saying that Waters paid or will pay rent to Dibble, Epp stated: "It comes down to whoever has the money. Right now Waters is the only account that has money in it. And also he was permitted to take the rent from I believe it's 188 Upper Powy's Road when we didn't have the money. So they paid him directly."[32] He further explained: "There is a residential renter on one of the properties there, and we allow Stewart to keep that

---

[25] Id. at p. 116.
[26] Id.
[27] Id.
[28] Id.
[29] Id. at p. 173.
[30] Id.
[31] Id. at p. 174.
[32] Id. at p. 176.

9

rent every month in lieu of our obligation to pay him his lease payment."[33] Remarkably, this last-referenced arrangement was never mentioned by Dibble even though he was asked several times about the matter.

Overall, this testimony, from both Stewart Dibble and William Epp, is contradictory and confusing. It is not credible and cannot serve as the basis for a finding that BBH leased the property from Dibble.

The court rejects Plaintiff's argument, however, that without a lease, the court must enforce the lien on the basis of the holding in Kelly v. Hannan, 566 A.2d 318 (Pa. 1989). True, there the court found the proffered lease fraudulent, "produced ... at the time of the hearing in order to engage the language of Section 1303(d)."[34] Id. at 318. The reason the lien was enforced, however, was not simply for the lack of a lease, but because the alleged tenant (who did not in fact own the property) had led the contractor to believe that he did own the property, and the owner knew of the "tenant's" intention to contract with the contractor as if he were the owner. Specifically, the court found the following to be the "boundary mark" for its inquiry: "The owner of leased property may be found liable for the improvements a tenant has made if the owner has not acted in good faith throughout the transaction knowing that the tenant intends to make a contract acting as if he were the owner. Where facts are withheld and any attempt is made to mislead the contractor and the owner has promised to pay for the cost of the improvements, the theory of estoppel will lie." Id. at 316 (citation and internal quotation marks omitted). The Court found "the contractor believed that he was contracting with the owners of the property and the Hannans knew of the

---

[33] Id.
[34] The property was owned by the parents of the daughter and son-in-law who contracted with the plaintiff to build a house on the property."

10

Thompsons' intentions to contract with Mr. Kelly as though they were the owners", and that "the appellee failed to act with good faith throughout the transaction." Id. at 318.

That the Court applied the above-quoted language as it's "boundary mark" in spite of its finding that there had been no lease, clearly indicates that when property is owned by one person but the contract is entered by another, the focus is not on the existence of a lease but, rather, on the conduct of the parties with respect to the contractor's belief regarding ownership. In the instant case, it is clear that Defendants did not mislead Plaintiff into thinking that BBH owned the property. The Operations Plan submitted at the beginning of the project clearly identifies Dibble as owner of three of the four parcels at issue. And, while Plaintiff argues that Epp and Dibble have acted in bad faith throughout the transaction by, inter alia, representing to the Bank that the money sought to be loaned was for the purpose of paying Plaintiff but then failing to pay, and by promising Plaintiff they would be paid but then not paying them, and while such could indeed constitute bad faith, it is not the type of bad faith relied on by the Court in Kelly in enforcing a lien despite Section 1303(d)'s requirement of a signed consent: bad faith with respect to the identity of the true owner of the property.

**The May 31, 2012, deed**

As noted above, on May 31, 2012, Dibble and Mary Ann Hill-Yoder executed a deed purporting to transfer all their interest in "five parcels and lots of

11

land" in Lewis Township to BBH.[35] The deed has not been recorded. Defendants concede that recording is not necessary to transfer title, but argue that delivery is necessary and that the deed was never delivered. As Defendants note in their brief filed November 12, 2014, "whether there has been delivery depends on the intention of the grantor as shown by his words and actions and by the circumstances surrounding the transaction." In the instant case, actions speak much louder than words.

Both Dibble and Epp testified that although the deed was executed, it was to be held by their (previous) attorney until all conditions had been satisfied, referring to the four items listed in the March 15, 2012, agreement. Dibble testified that two of the four items had not been paid and therefore the deed had not been delivered.[36]

Against this testimony the court balances the much weightier evidence that the transaction *had* been completed, and that failure to record the deed was not intentional but a fortuitous (for Defendants) oversight. First, the March 15, 2012, agreement was quite clear that "each aspect of the foregoing transaction is mutually interdependent with the other aspects, deed transfer and BB Holdings membership interest transfers must occur simultaneously". The membership was transferred on March 15, 2012. Second, in support of BBH's application for a loan, the Bank was provided with a copy of the deed but never informed that it was being "held", and was led to believe that the property was owned by BBH. Third, Dibble signed the Business Loan Agreement and the Mortgage as "Member of Black Bear Holdings, LLC", but *not* individually, instead signing a

---

[35] Ms. Hill-Yoder's signature was obtained to convey "any and all rights, title and interest she may have retained, reserved, received or obtained" when she deeded the property to Dibble in 2009. See Plaintiff's Exhibit 24.
[36] No one purported to know where the original deed is presently located.

12

Commercial Guaranty to personally guarantee the loan. Fourth, the items listed in the agreement were represented at trial to be liens on the property, and inasmuch as the Bank went through with the closing without directly paying three of the four items in spite of its stated requirement that it have a first lien on the property, they must have been paid off prior to closing, contrary to the testimony. Finally, in the Luzerne County lawsuit, Defendants asserted that "Stewart Dibble has no personal ownership of any of the property". The court has no trouble concluding that this is actually the truth, based on its finding that Dibble intended to complete the transaction when he executed the deed on May 31, 2012.

## Equitable Ownership of the Property

Plaintiff argues that even if the deed had not been delivered, BBH had an equitable interest in the property by virtue of the March 15, 2012, agreement, and thus the property could nevertheless be subject to a mechanic's lien. While the court considers it unnecessary to even address the issue, based on the court's finding that title had actually transferred to BBH prior to the claim having been filed, Plaintiff is indeed correct. Based on the March 15, 2012, agreement, BBH held equitable title to the property. *See* Arnold v. Cessna, 25 Pa. 34 (1855). Moreover, in Stratford v. Boland, 452 A.2d 824, 825 (Pa. Super. 1982), the Superior Court stated:

> We can readily dispense with appellant's claim that a mechanic's lien could not have been properly imposed on the property because the contract in question was not made with the property's owner.
>
> Although the contract was made before appellant acquired an interest in the property, the lien claim was filed after he had acquired an

13

equitable interest in it.

> The contract upon which Mr. Stratford bases his claim was made with the person, who at the time the lien was filed, had equitable interest in the property. An equitable interest is such that its holder is considered an owner for purposes of the Mechanic's Lien Law. See 49 **P.S.** § 1201, defining "owner"; *McClure v. Fairfield,* 153 **Pa.** 411, 26 A. 446 (1893). We believe that since Mr. Boland was the owner at the time the lien was filed, and was the person with whom Mr. Stratford contracted, that the claim could be validly filed against his property.

The lien is clearly proper in the circumstances of the instant case.

## The "insignificant" wires

Defendants contend Plaintiff is not entitled to a lien against Parcel 151 because the only "construction" on that parcel is the installation of wiring, which runs from an electric pole through a previously existing building, into and out of a junction box and then underground along that building to the various components of the water withdrawal facility which is located on the other three parcels. It is clear from the evidence that no construction in the ordinary sense of the word took place on parcel 151, only the installation of the wires and a junction box (inside the building). Defendants argue that the wiring is "such an insignificant part of this improvement that it is not within the definition of improvement under the Act."[37] Plaintiff counters by citing B.N. Excavating, Inc. v. PBC Hollow-A, L.P., 71 A.3d 274 (Pa. Super. 2013), which refers to the Black's Law Dictionary definition of incidental as "Subordinate to something of greater importance; having a minor role." Black's Law Dictionary 765 (7th ed. 1999). The court

14

agrees with Plaintiff that the wiring is "incidental" to the water withdrawal facility, but it is not clear how this helps Plaintiff, other than to support a finding that Plaintiff is entitled to a lien for the labor and materials expended laying the wires. It does not necessarily follow that that lien should be on the property wherein the wires lay. The court draws this conclusion based on the following sections of the lien law:

§ 1301. Right to lien; amount; subcontractor
(a) General Rule. Except as provided under subsection (b), every *improvement* and the estate or title of the owner *in the property* shall be subject to a lien, to be perfected as herein provided, for the payment of *all debts due* by the owner to the contractor or by the contractor to any of his subcontractors *for labor or materials furnished in the erection or construction*, or the alteration or repair of the improvement, provided that the amount of the claim, other than amounts determined by apportionment under section 306(b) of this act, shall exceed five hundred dollars ($ 500).

49 P.S. Section 1301 (emphasis added). Section 1201 provides the definition of improvement: "any building, structure or other improvement of whatsoever kind or character erected or constructed on land"; the definition of property: "the improvement, the land covered thereby and the lot or curtilage appurtenant thereto"; and the definition of erection and construction: "the erection and construction of a new improvement". Significantly, it also provides the following: "erection, construction, alteration or repair" includes: ... (c) Furnishing, excavating for, laying, relaying, stringing and restringing ... wires, whether on the property improved *or upon other property*, in order to supply services to the improvement. 49 P.S. Section 1201 (emphasis added). This latter

---

[37] N.T., October 14, 2014, at p. 181.

15

definition implies that the furnishing of wires may be included in the amount of the lien, but by reference to "other property" separate from "the property improved" it is clear that "other property" is not to be included in the lien. Therefore, the court agrees with Defendants that Parcel 151 is not subject to Plaintiff's mechanics' lien claim.

## CONCLUSIONS OF LAW

(1)     Plaintiff is entitled to a mechanics' lien in the amount of $216,074.38 for labor and materials furnished in the construction of the water withdrawal facility.

(2)     The lien is properly placed on Parcel numbers 24-268-183.A, 24-268-152 and 24-268-149.

## ORDER

AND NOW, this 17th day of January 2015, for the foregoing reasons, judgment on the mechanic's lien is hereby entered in Plaintiff's favor in the amount of $ 216,074.38 with interest at the legal rate, against and upon the property identified as Lycoming County Tax Parcel numbers 24-268-183.A, 24-268-152 and 24-268-149.

BY THE COURT,

Dudley N. Anderson, Judge

cc:     Timothy J. Woolford, Esq.
            101 North Pointe Blvd., Ste. 200, Lancaster, PA 17601
        Scott T. Williams, Esq.
        Gary Weber, Esq.
        Hon. Dudley Anderson

16